J. S23031/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  C.H.M., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.M., FATHER | : | No. 3433 EDA 2019 |

Appeal from the Decree Entered November 5, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-AP-0000599-2019

| | | |
|---|---|---|
| IN THE INTEREST OF:  C.H.M., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.M., FATHER | : | No. 3434 EDA 2019 |

Appeal from the Order Entered November 5, 2019,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-DP-0000715-2018

BEFORE:  NICHOLS, J., McCAFFERY, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JUNE 22, 2020**

In this consolidated appeal, M.M. ("Father") appeals from the November 5, 2019 decree granting the petition of the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his minor female child, C.H.M. ("Child") (born March 2018), pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b), and the order changing

Child's permanency goal from reunification to adoption.[1]  After careful review,

we affirm.

The juvenile court summarized the relevant facts and procedural history

of this case as follows:

> This family became known to DHS on March 14, 2018,
> after receiving a General Protective Services ("GPS")
> report alleging that there were concerns regarding
> Child's safety in the care of Mother due to Mother's
> heroin addiction; Child was born [in March 2018], with
> drugs in her system and Child experienced
> withdrawal; Mother stated that Father sold
> prescription medication; Father's home lacked heat
> and hot water; there was drug paraphernalia in
> Father's home; Father used marijuana and abused
> alcohol; there was a history of domestic violence
> between Mother and Father; while Mother was
> homeless, Father convinced Mother to return to his
> home by offering her heroin; Father has a criminal
> history; Father had an active warrant for his arrest for
> harassment; and Father did not have the supplies to
> care for Child and Child was expected to be discharged
> from Thomas Jefferson Hospital ("Hospital") with
> Mother [two days after her birth].  This report was
> determined to be valid.  On that same day, DHS
> visited Child at Hospital.  Mother indicated to DHS that
> she was unable to care for Child and wanted Father to
> care for her.  Hospital staff confirmed to DHS that
> Child tested positive for opioids, was being monitored
> for withdrawal, and that Child's discharge date was
> unknown. Maternal Grandmother later contacted DHS
> via telephone on the same date and stated that Father
> was unfit to care for Child.  Maternal Grandmother
> indicated that Father perpetuated Mother's drug use
> and provided Mother with drugs.
>
> On March 15, 2018, DHS received supplemental
> information that stated Child was born addicted to

---

[1] The record reflects that the juvenile court also terminated Mother's parental rights to Child on November 5, 2019.  Mother is not a party to this appeal.

opiates and was experiencing withdrawal, Father was employed, and Father purchased drugs for Mother. On March 16, 2018, DHS visited Father at his home. Father denied any drug use or history of mental illness. Father indicated that Mother did not reside in his home, but she did have keys to the home and he would allow her to stay there if she needed to rest. DHS expressed concern to Father regarding Mother's access to the home if Child were placed in his care. Father stated that he was determined to be Child's primary caregiver. DHS conducted a home assessment of Father's home and found that his home lacked hot water. On that same date, DHS received additional information that Child was born at 40 weeks gestation and weighed six pounds and seven ounces at birth; Child was in the Neonatal Intensive Care Unit and was receiving morphine for her withdrawal symptoms; and that Father was abusive to Mother.

On March 29, 2018, Hospital contacted DHS and informed them that Child was ready for discharge. On that same date, DHS obtained an Order of Protective Custody ("OPC") for Child and placed her in foster care.

On March 30, 2018, a shelter care hearing was held for Child. Father was not present for this hearing. The [juvenile] court lifted the OPC and ordered the temporary commitment of Child to stand. Father was granted supervised visits with Child between March 30, 2018, and the upcoming adjudicatory hearing for Child. DHS filed a dependency petition for Child on April 5, 2018.

On April 10, 2018, an adjudicatory hearing was held for Child. Father was present for this hearing. Child was adjudicated dependent based on present inability of the parents to provide proper parental care, control, and supervision. The [juvenile] court discharged the temporary commitment to DHS and fully committed Child to the custody of DHS. Father was referred to the Clinical Evaluation Unit ("CEU") for a forthwith drug and alcohol screen, dual diagnosis assessment, monitoring, and three random drug

screens. Father was also referred to the Genetic Testing Unit for a paternity test. Father was also ordered to attend supervised visits at [DHS] with Child with 24 hours['] confirmation. At Father's forthwith drug and alcohol screen, Father tested positive for alcohol.

On April 25, 2018, the Community Umbrella Agency ("CUA") created an initial single case plan ("SCP"). Father's objectives were to attend visits as scheduled; ensure the paternity test is completed; attend the Achieving Reunification Center ("ARC") and participate in recommended services; and to participate in domestic violence counseling when scheduled.

On June 25, 2018, a permanency review hearing was held for Child. Father was present for this hearing. The [juvenile] court found that Child's placement continued to be necessary and appropriate, and ordered the commitment to DHS to stand. Father was ordered to provide proof of employment and that New Jersey Children and Youth Services conducted a home assessment of Father's home in New Jersey.[2] Father was also referred to the CEU for a forthwith drug and alcohol screen. Father was ordered to attend twice weekly supervised visits with Child at [DHS] and the visits may be modified by agreement of the parties prior to the next court date.

On September 25, 2018, a permanency review hearing was held for Child. Father was present for this hearing. The [juvenile] court determined that Father was minimally compliant with the permanency plan and that Father was employed. The [juvenile] court also determined that Child's placement continued to be necessary and appropriate, and ordered her commitment to DHS to stand. Father was re-referred to ARC for appropriate services and to Behavioral Health Services ("BHS") for consultation, evaluation, and monitoring. Father was ordered to complete healthy relationships, a housing workshop,

_____

[2] The record is unclear as to the exact date Father returned to Pennsylvania.

and parenting. Father's visitation with Child was not modified.

On December 11, 2018, a permanency review hearing was held for Child. Father was not present for this hearing. The [juvenile] court determined that Father was minimally compliant with the permanency plan, Father is employed and has provided CUA with proof of employment, and Father declined ARC services due to his work schedule. The [juvenile] court found that Child's placement continued to be necessary and appropriate, and ordered her commitment to DHS to stand. The [juvenile] court re-referred Father to BHS for a consultation and evaluation and to ARC for appropriate services.

On March 5, 2019, a permanency review hearing was held for Child. Father was not present for this hearing. The [juvenile] court determined that Father was non-compliant with the permanency plan; Father was referred to ARC for services but was discharged from ARC due to lack of participation; Father did not comply with the BHS evaluation; and Father had not attended supervised visits since December 2018. The [juvenile] court also determined that Child's placement continued to be necessary and appropriate, and ordered her commitment to DHS to stand. The [juvenile] court referred Father to BHS for a consultation and evaluation, once he availed himself, and to ARC for parenting, housing, employment, and healthy relationships. Father was ordered to comply with all SCP objectives and recommendations. Father's visits were decreased to biweekly supervised visits at the agency.

On May 28, 2019, a permanency review hearing was held for Child. Father was present for this hearing. The [juvenile] court determined that Father was non-compliant with the permanency plan; Father was residing with Paternal Grandfather; Father was employed; and Father had not attended a visit with Child since March 5, 2019. The [juvenile] court also determined that Child's placement continued to be necessary and appropriate, and ordered her

> commitment to DHS to stand. The [juvenile] court referred Father to BHS for a consultation and evaluation. The [juvenile] court also ordered Father to provide CUA with proof of employment.
>
> On July 26, 2019, the SCP was revised. Father's objectives were to attend visits, as scheduled; attend ARC and participate in recommended services; and to participate in healthy relationships counseling, as scheduled.

Juvenile court opinion, 1/9/20 at 1-4 (footnotes omitted).

On August 9, 2019, DHS filed a petition to involuntarily terminate Father's parental rights to Child and change the permanency goal from reunification to adoption. Thereafter, on November 5, 2019, the juvenile court conducted a termination hearing; Father was present for this hearing and was represented by counsel. Following the hearing, the juvenile court entered a decree involuntarily terminating Father's parental rights to Child pursuant to Sections 2511(a)(1), (2), (5), (8), and (b), and an order changing the permanency goal from reunification to adoption. (**See** notes of testimony, 11/5/19 at 70-71.) On December 4, 2019, Father filed two separate, timely notices of appeal for each docket number, in compliance with **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), and its progeny. Contemporaneously with these notices of appeal, Father filed two concise statements of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(2)(i). On January 9, 2020, the juvenile court filed its Pa.R.A.P. 1925(a) opinion. This court **sua sponte** consolidated Father's appeals by **per curiam** order on January 29, 2020.

Father raises the following issues for our review:

1. Did the [juvenile c]ourt err in terminating [Father's] parental rights under [23 Pa.C.S.A. §§] 2511 (a)(1)[,] (a)(2), (a)(5), and (a)(8)?

2. Did the [juvenile c]ourt err in finding that termination of [Father's] parental rights best served [Child's] developmental, physical and emotional needs under [23 Pa.C.S.A. §] 2511(b)?

3. Did the [juvenile] court err in changing [Child's] goal to adoption?

Father's brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and internal quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined "clear and convincing evidence" as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the juvenile court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**§ 2511.  Grounds for involuntary termination**

**(a)**  **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental

> rights would best serve the needs and welfare of the child.
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). We need only agree with the juvenile court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm a decree terminating parental rights. *In re M.M.*, 106 A.3d 114, 117 (Pa.Super. 2014).

Instantly, we analyze the juvenile court's decision to terminate Father's parental rights to Child under Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa.Super. 2015) (citations and internal quotation marks omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***Id.*** "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re A.L.D.***, 797 A.2d 326, 340 (Pa.Super. 2002) (internal quotation marks and citations omitted).

Upon review, we find that there was clear and convincing evidence to support the juvenile court's termination of Father's parental rights to Child, pursuant to Section 2511(a)(2). The record establishes that "incapacity" under Section 2511(a)(2) exists given that Father has demonstrated a

repeated and continual inability to fully satisfy his SCP objectives. As noted, DHS became involved in this matter in March 2018 after Child tested positive for opioids at birth. (Notes of testimony, 11/5/19 at 11-12.) At the time of the November 5, 2019 termination hearing, Child was approximately 19 months old and had been in a pre-adoptive foster home for nearly 11 months. (*Id.* at 18.) Tyesha Grasty, the CUA case manager assigned to this matter, testified that Father's SCP objectives for reunification with Child included the following: (1) attend housing, parenting, healthy relationships, and anger management counseling at ARC; (2) provide proof of employment; (3) participate in bi-weekly evaluations at BHS; (4) attend medical appointments for Child; (5) participate in supervised visitation with Child; and (6) attend the CEU for forthwith and random drug screening evaluation. (*Id.* at 20.)

Grasty's testimony during the termination hearing reveals that Father has failed, in large part, to satisfy the majority of his SCP objectives. Specifically, Grasty testified that as of the date of the termination hearing, Father had yet to complete the housing program at ARC. (*Id.* at 23.) Father acknowledged during the termination hearing that he has failed to acquire stable housing, and the record reflects that Father only began to search for appropriate housing after the August 9, 2019 termination petition was filed. (*Id.* at 22, 45-46, 51.) Grasty also testified that at the time of the termination hearing, Father had yet to participate in anger management counseling. (*Id.*

at 22.) Father testified that he was scheduled to begin the anger management program on November 6, 2019, the day after the termination hearing, due to being placed on a wait list, but could not recall the date he first attempted to enroll in the program. (*Id.* at 22, 45.) Grasty further testified that Father only began attending healthy relationships counseling in October 2019, a month before the termination hearing, but has yet to complete the program. (*Id.* at 21-23.) Likewise, Grasty noted that Father only completed the parenting program at ARC on October 30, 2019, less than a week before the termination hearing. (*Id.* at 21, 41.) Additionally, Grasty testified that although Father has previously provided proof of employment and testified that he works for Uber and ServPro disaster restoration, he has failed to update CUA since the last hearing. (*Id.* at 22-23, 44, 54.)

The record further reflects that the juvenile court ordered Father to attend BHS for an evaluation on July 11, 2018, March 5, 2019, and May 28, 2019, but Father elected to disregard the juvenile court's orders, and his BHS evaluation was not completed until June 14, 2019. (*Id.* at 32, 67-68.) Additionally, although Father did complete a drug and alcohol screen at CEU, the record reflects that Father failed to attend two of five random drug screens within the required 24 hours. (*Id.* at 39-41.) A number of these tests came back positive, but Father denied taking drugs and claims he has a prescription for Adderall. (*Id.* at 48.)

The record also reveals that Father's visitation with Child has been inconsistent. Father was initially granted weekly-supervised visitation with Child, but by the March 5, 2019 permanency review hearing, Father's visitation had been reduced to biweekly due to his failure to visit Child from December 2018 to April 2019. (*Id.* at 24.) During the termination hearing, Grasty expressed concern over Father's failure to consistently appear on time and act appropriately during his visits with Child. (*Id.* at 24-25.) Specifically, Grasty testified that although Father began to visit Child again in April 2019, he developed a pattern of arriving approximately 15 to 20 minutes late to each scheduled visit. (*Id.* at 25.) Grasty further noted that during Child's hospitalization in April 2019, Father did not attempt to visit Child. (*Id.* at 36.) Additionally, Grasty testified that she personally supervised some of Father's visits with Child and became concerned that Father was not cleaning Child properly and had to be instructed to change Child's diaper before the visitation concluded. (*Id* at 25, 36.)

Father, in turn, testified on his own behalf at the termination hearing and opined that he was fully compliant with the SCP objectives and just lacked appropriate housing, a claim that is clearly belied by the record. (*Id.* at 57.)

Based on the foregoing, we agree with the juvenile court that there exists clear and convincing evidence of record to terminate Father's parental rights to Child pursuant to Section 2511(a)(2). *See In re Adoption of C.D.R.*, 111 A.3d at 1216.

Next, we consider Father's contention that the termination of his parental rights was improper under Section 2511(b) because it was not in Child's best interests. (**See** Father's brief at 16.) In support of this contention, Father avers that he shares a bond with Child and "[i]t is clear that Father and [Child] having a loving relationship which benefits [Child]." (**Id.** at 17.)

With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability. . . . [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

**In re T.S.M.**, 71 A.3d at 267 (internal case citations omitted).

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted). Additionally, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers

- 15 -

can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted). This court has long recognized that,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

**In re Adoption of C.D.R.**, 111 A.3d at 1219 (citations and internal quotation marks omitted).

Upon review, we find that the record supports the juvenile court's determination that the termination of Father's parental rights was clearly in the best interests of Child, pursuant to Section 2511(b). At the termination hearing, Grasty testified that Child shares a "primary parental relationship" with her foster mother and paternal aunt, R.M. ("Aunt"), with whom Child has resided with in the pre-adoptive home since January 2019. (Notes of testimony, 11/5/19 at 5, 18-19.) Grasty testified that Child requires specialized medical care and that Aunt provides for her medical, emotional, and daily needs. (**Id.** at 18-19, 29.) Grasty further testified that the interaction between Child and Aunt "goes very well[]" and that Child "looks to [Aunt] as her caregiver." (**Id.** at 18-19.) In contrast, Grasty testified that

she does not believe that Child shares a relationship with Father based on her young age and Father's failure to consistently meet his SCP objectives "throughout the life of the case." (*Id.* at 27.) Grasty testified that she does not believe that Child is bonded with Father. (*Id.* at 28.) Grasty further opined that Child would not suffer any irreparable harm if Father's parental rights were terminated and that adoption is clearly in Child's best interests. (*Id.* at 27.) The juvenile court found Grasty's testimony credible. (Juvenile court opinion, 1/9/20 at 23.)

Our standard of review requires us to accept the juvenile court's findings of fact and credibility determinations where, as here, they are supported by the record. *See In re T.S.M.*, 71 A.3d at 267. Accordingly, Father's contention that termination of his parental rights was improper under Section 2511(b) must fail.

In his final claim, Father contends that "the [juvenile] court err[ed] in changing [Child's] goal to adoption[.]" (Father's brief at 4.)

We review the court's goal change order determination for an abuse of discretion. *Interest of A.B.*, 19 A.3d 1084, 1088 (Pa.Super. 2011). The Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375, governs proceedings to change a child's permanent placement goal and juvenile courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and

- 17 -

appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

***Interest of A.B.***, 19 A.3d at 1088-1089 (citations and internal quotation marks omitted).

Additionally, Section 6351(f.1) requires the juvenile court to make a determination regarding the child's placement goal:

**(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

. . . .

(2)    If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1)(2).

Here, our review reveals that Father has waived this claim by failing to raise it in the argument section of his appellate brief. (**See** Father's brief at 9-17.) "It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." ***In re M.Z.T.M.W.***, 163 A.3d 462, 465 (Pa.Super. 2017).

Even accepting for the sake of argument that Father did not waive this claim, we would find that the record fully supports the juvenile court's conclusion that it was in Child's best interests to change the permanency goal from reunification to adoption. (**See** juvenile court opinion, 1/9/20 at 20-23.)

Based on the foregoing, we conclude that the juvenile court did not abuse its discretion by involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2) and (b), and changing Child's permanency goal from reunification to adoption. Accordingly, we affirm the juvenile court's November 5, 2019 decree and order.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/20